JOSEPH J. KAZALA, CLAIMANT-RESPONDENT, v. THE
PRUDENTIAL INSURANCE COMPANY OF AMERICA,
RESPONDENT-APPELLANT.

Argued March 2 and 9, 1953—Decided March 30, 1953.

*Mr. William L. Dill, Jr.,* argued the cause for the appellant (*Messrs. Stryker, Tams & Horner,* attorneys).

*Mr. Charles P. Berman* argued the cause for the respondent (*Messrs. Rose & Berman,* attorneys).

The opinion of the court was delivered by

BURLING, J. This is an appeal from an order of the State Department of Labor and Industry, Division of Employment Security, Disability Insurance Service (hereinafter referred to as the Division) whereby the claimant-respondent Joseph J. Kazala (hereinafter called Kazala) was awarded disability benefits from October 24, 1951 to March 6, 1952 for alleged disability under a private disability plan of the defendant-appellant, the Prudential Insurance Company of America (hereinafter called Prudential). The appeal was addressed to the Superior Court, Appellate Division, under *Rule* 3:81. Prior to hearing there, certification was allowed upon our own motion.

Kazala, on January 7, 1952, through his attorneys filed with the Division a complaint, later formally reasserted, against Prudential, alleging that Prudential had denied him disability benefits from October 22, 1951 under Prudential's disability insurance benefit plan (Group Policy GD–9600 effective January 1, 1949) approved by the Division on December 23, 1948 and an amendment thereto effective January 1, 1950, approved by the Division on January 6, 1950, collectively designated by the Division as "Private Plan No.

111–4750." Kazala alleged that he was "totally disabled from performing the duties of my job since October 22, 1951." The award for compensation was made to March 6, 1952, and from this he did not appeal. Hearings on Kazala's claim were held before a hearing officer of the Division on March 28, 1952 and April 8, 1952. The Division hearing officer determined the matter in favor of Kazala, and on September 4, 1952 an order was entered awarding him disability benefits from October 24, 1951 to March 6, 1952 "in accordance with the provisions of Private Plan No. 111–4750," counsel fee of $90 and a medical witness fee of $15 for each of the two physicians who testified for Kazala. It was from this order of September 4, 1952 that Prudential appealed.

The Temporary Disability Benefits Law, *L.* 1948, *c.* 110, *p.* 586, *sec.* 1 *et seq., N. J. S. A.* 43:21–25 *et seq.,* provides for the establishment by employers of private plans for the payment of disability benefits in lieu of the benefits of the state plan established by the statute. It provided that such a private plan should be approved by the Division if it should find that, *inter alia,* eligibility requirements for benefits under such private plan are no more restrictive than as provided in the statute for benefits payable by the state plan and the weekly benefits payable under such private plan for any week of disability are at least equal to the weekly benefit amount payable by the state plan (*L.* 1948, *c.* 110, *p.* 590, *sec.* 8, as amended *L.* 1950, *c.* 173, *sec.* 2; *N. J. S. A.* 43:21–32). This situation is provided for under part II, section 2 (e) of the hereinbefore mentioned policy defining the Prudential private plan.

The provisions in part I of the policy are more liberal in respect to amounts,* but more restrictive in respect to eligibility requirements, than the state plan.

---

* Note: Part I, sec. 2, pars. (b) (c) and (d) of the Prudential private plan (both in the original plan and as amended effective January 1, 1950) provide more liberal payments both in amount and inception or duration of payments than is established for a person entitled only to benefits under the statute. For instance, in the private plan benefits under part I are payable immediately whereas under the statutory plan no benefits are allowable for the first

The questions involved in this appeal are within a narrow scope and may be pithily expressed as follows:

(a) Under the facts of this case does Kazala qualify for disability benefits under part II, section 2(e) of the private plan? If so, in what amount?

(b) Does Kazala qualify for benefits under part I of the private plan, which is more liberal in payments but more restrictive as to eligibility requirements than the state plan?

Our conclusions are that:

(a) Under the facts of this case Kazala is not entitled to recover benefits under part I of the Prudential private plan;

(b) Under the facts of this case Kazala is entitled under part II of the Prudential private plan to recover benefits under the statutory formula (*i. e.*, the state plan) for the period of October 31, 1951 to November 15, 1951.

The provisions of Private Plan No. 111–4750 (namely Prudential's Group Policy GD–9600, amended as approved

---

seven consecutive days of disability, *L.* 1948, *c.* 110, *p.* 595, *sec.* 15, *clause* (a) *N. J. S. A.* 43:21–39(a); benefits are payable (to an employee of Kazala's length of service) for a maximum of 52 weeks under the private plan, part I, whereas under the statute the maximum period is 26 weeks, *L.* 1948, *c.* 110, *p.* 594, *sec.* 14, *N. J. S. A.* 43:21–38; and the part I, private plan maximum benefit (for an employee of Kazala's length of service) is 80% of "full Base Salary (up to the first $15,000 per annum) on a weekly basis (the uncontroverted testimony of Kazala is that he earned $80 per week—the result being that, if entitled to benefits under part I, he would receive sickness benefits of $64 per week), whereas under the statute the maximum weekly benefit at the time in question was $26, *L.* 1948, *c.* 110, *p.* 596, *sec.* 16, as am. *L.* 1950, *c.* 173, *p.* 397, *sec.* 4, *N. J. S. A.* 43:21–40 (the statute has since been amended by *L.* 1952, *c.* 188, *sec.* 4, effective July 1, 1952, to provide a maximum of $30 per week). In addition, the private plan provided that in the event of an initial absence from duty on account of disability in any given year of service, an employee entitled to benefits under part I should receive full pay for a primary portion of his disability period of from 2 to 4 weeks. It is noted that Kazala, even if otherwise entitled to benefits under part I of the private plan, would not have been entitled to the full-pay provision inasmuch as his testimony demonstrated that his service year ran from December to December, and in 1951 he had already received disability benefits for a prior illness from January 8 to March 26, approximately 10½ weeks.

by the Division) directly involved are part I, section 2(a); part I, section 2(g); and part II, section 2(e). These provisions read as follows:

Part I, sec. 2(a): "(a) If an Employee, while covered for the benefits under this Part I, becomes wholly disabled from accidental bodily injury or sickness so as to be prevented from performing any and every duty pertaining to any occupation for remuneration or profit, the Group Accident and Sickness Benefits hereinafter provided under this Part I will be payable while the Employee remains so disabled and absent from work, subject to the provisions hereinafter stated."

Part I, sec. 2(g): "(g) The benefits under this Part I are subject to the provisions for integration with various Temporary Disability Benefits laws and similar legislation, whether State or Federal, set forth in Part II hereof, and to the General Provisions set forth in Part III hereof and to the provisions of Part IV hereof."

Part II, sec. 2(e): "(e) Notwithstanding anything in this Policy to the contrary, any New Jersey Employee of the Policyholder for whom no specific benefits are provided under this policy will receive, for any period of disability commencing while covered under the Private Plan, whatever benefits would be payable to the Employee under Article III of the New Jersey Temporary Disability Benefits Law but for his coverage under a private plan, and any New Jersey Employee of the Policyholder for whom specific benefits are provided under this Policy will receive, for any period of disability commencing while covered under the Private Plan, not less than the benefits which would be payable to the Employee under Article III of the New Jersey Temporary Disability Benefits Law but for his coverage under a private plan; in either case, taking into consideration, to the extent permitted by law and authorized regulations, any Temporary Disability Benefits payable from any source other than the Private Plan."

Other portions of the private plan will be adverted to where necessary in the construction or application of the foregoing provisions.

The factual determinations in the present case were laid primarily upon testimony of Kazala and his medical witnesses. Prudential called no witnesses, but entered into evidence certain papers hereinafter to be mentioned. It appears that Kazala entered Prudential's employment in December 1936 as an agent, in which capacity he remained for five years. He was then promoted to assistant superintendent and placed in charge of a group of agents, and

remained in the same position (although the title was changed) until he stopped work in October 1951. Kazala's initial contention before the Division was that he was an employee who was a covered individual within the provisions of the state plan and was also a "full-time employee" of Prudential within the classification thereof contained in part I of the private plan. Prudential does not here contest this contention.

This reduces the factual question to one of physical disability determination. Then application must be made of the remaining eligibility provisions of part I and part II of the private plan.

Chronologically the evidence in the present case shows:

(a) Kazala not later than August 29, 1951 had formed the intent to change his employment and to apply to the New Jersey Real Estate Commission for a license as a real estate salesman to represent a licensed real estate broker, John P. McMahon. Kazala's application for the license, which was endorsed by Mr. McMahon as "employing broker," was subscribed and sworn to by Kazala on August 29, 1951, although Kazala had testified he completed the form on October 11, 1951. On October 10, 1951 Kazala forwarded this application to the New Jersey Real Estate Commission and on the same day he sent a letter of resignation to Prudential, to be effective October 29, 1951. Later he wrote Prudential another letter stating that he would like to withdraw his resignation because he was sick. Kazala's application for a real estate salesman's license was approved for examination and his cash fee (payable to the New Jersey Real Estate Commission upon such approval) was paid on October 26, 1951. He testified that he took the examination two or three weeks later and thereafter received his real estate salesman's license. This latter testimony appears to be strongly contradicted by the endorsements upon his application, which show that his license and directory card were issued October 29, 1951. Further Kazala testified that when he stopped working with Prudential he "took it easy" as the doctors "suggested," but took "a little interest in real estate."

His own testimony, however, was that he had been "definitely entertaining the thought" of making a change of employment "back to 1950" and that he had made inquiries "about a different type of work" in the summer of 1951. He did not testify either that he was unable to perform or did not perform any duty as a real estate salesman from October 22, 1951 to the date of the hearings in this matter.

(b) On October 23, 1951 Kazala ceased working for Prudential. On the same date he was treated by his family physician, Dr. Edmund Lewandowski. Doctor Lewandowski at first testified as to Kazala's medical history taken on that date, namely asserted tiredness about the heart, pain, exhaustion and difficulty in breathing, and that on examination of Kazala he found "nothing particularly abnormal," no objective signs or evidence of injury, disease or disability. However, he had prescribed cardiac medication and sedation and "sent" Kazala "to a cardiologist." Dr. Lewandowski testified that Kazala then could not "perform his regular duties." Subsequently during the course of cross-examination he testified that Kazala "could not work," but later admitted that he based the latter statement "partly on the testimony the man gave" at the hearing.

(c) On October 24, 1951 Kazala was examined and treated by a specialist in internal medicine and cardiology, Dr. Mortimer L. Schwartz. Dr. Schwartz testified his clinical examination and fluoroscopic examination of Kazala and an electrocardiogram he took of Kazala's heart action showed that he was normal but that a ballisto-cardiogram taken "was borderline in that there was a slurring of what is known as the Joseph Kazala stroke." He later admitted that this "slurring" was in and of itself of no significance. Based upon the result of this ballisto-cardiogram and the history Kazala related to him, Dr. Schwartz "felt" that Kazala was "suffering myocardial arteriosclerosis with an anginal syndrome," and recommended immediate "removal from his present environment." Based on the examination of Kazala he performed in October 1951 and on Kazala's testimony concerning his duties (given at the hearings in 1952), Dr.

Schwartz testified that in his opinion Kazala could not perform those duties. He testified that he had recommended to Kazala that he "cease work immediately and rest for a period of about three months." He did not testify directly that Kazala at any time was so incapacitated that he was disabled from performing any duty pertaining to any employment.

We now move to the application of the facts to the terms of the private plan.

## ELIGIBILITY FOR BENEFITS UNDER PART I.

The private plan in the present matter renders a full time employee hired on a permanent basis eligible for benefit under Part I only if he is "wholly disabled * * * so as to be prevented from performing *any and every duty* pertaining to *any* occupation for remuneration or profit * * *." (Emphasis supplied). See part I, section 2(a), quoted in full *ante*. The statutory criterion is disability "resulting in his total inability to perform the duties of his employment." *L.* 1948, *c.* 110, *p.* 588, *sec.* 5, *N. J. S. A.* 43 :21–29. The provisions of part I of the private plan are more stringent, rendering ineligible an employee where he is able to perform *any* duty pertaining to *any* occupation.

The leading case on the matter of eligibility requirements from a physical standpoint is *Nickolopulos v. Equitable &c., U. S.,* 113 *N. J. L.* 450 (*E. & A.* 1934), wherein the former Court of Errors and Appeals held (at *p.* 456) :

"Considering the policy as a whole, we think the court was quite justified in construing the words 'from engaging in any occupation or performing any work for compensation of financial value' as meaning: 'from performing any work for compensation of financial value in his regular business and any other pursuit for which he was qualified and which he would reasonably be contemplated to pursue.'"

and at *p.* 457:

"* * * If an insured has totally lost his ability to earn money in the only way he can, if he is totally unfit and unable to do the only

work he knows, he is totally disabled, at least until some new ability to earn his living is created."

In the present case, where inability to perform the duties of the employee's employment with Prudential is expressly covered by benefits allowable under part II, section 2(e) of the private plan, in effect incorporating the statutory provisions as above detailed, it would do violence to the wording of part I, section 2(a) to hold that the phrase there used means disability to perform only the duties of his employment with Prudential, or a mere partial disability to engage in any other occupation.

Kazala contends that the language of part I, section 2(a) in this respect is comparable to a "whole" and "total" disability clause of a contract of insurance which related disability to "performing any and every kind of duty pertaining to his occupation," which was construed in *Gross v. Com. Cas. Ins. Co. of Newark, N. J.*, 90 *N. J. L.* 594, 598, 599 (*E. & A.* 1917), and *Booth v. U. S. Fidelity and Guaranty Co.*, 3 *N. J. Misc.* 735, 738–739 (*Sup. Ct.* 1925). It was held in the *Gross* and *Booth* cases, *supra*, that to be totally disabled and prevented from performing any and every kind of work it was not necessary that the insured "be so disabled as to prevent him from doing anything whatsoever pertaining to his occupation or to any part of his business, but that he must be so disabled as to prevent him from doing any and every kind of business pertaining to his occupation, and that there was a difference between being able to perform any part and any and every kind of business." The *Booth* and *Gross* cases, *supra*, however, dealt with specific contractual language clearly related to the insured's employment and therefore are not applicable here.

Kazala further argues that the language of part I, section 2(a) of the Prudential private plan is within the principles expressed in *Woodrow v. Travelers Insurance Co.*, 121 *N. J. L.* 170, 176–177 (*E. & A.* 1938), namely:

(*p.* 176) "* * * A person may be able to do some work along lines in which he is qualified, and receive some remuneration therefor, without forfeiting benefits under an insurance policy which pre-

scribes a condition of 'total' or 'whole' disability. *Nickolopulos v. Equitable Life Assurance Society*, 113 *N. J. L.* 450; *Gross v. Commercial Casualty Insurance Company*, 90 *Id.* 594; *Booth v. U. S. Fidelity and Guaranty Co.*, 3 *N. J. Misc.* 735."

In the *Woodrow* case, *supra,* the contractual language was that the employee be "wholly disabled * * * from engaging in any occupation or employment for wage or profit" (see 121 *N. J. L.*, at *p.* 172), and the former Court of Errors and Appeals applying the above quoted principles held that under the circumstances of that case it was for the jury to determine whether the employee was "wholly disabled."

The contract before us, however, is more restrictive for it defines disability to exist only where a *full-time* employee is disabled from *performing any duty* pertaining to any occupation. The obvious intendment of this language is to foreclose resort to benefits by an employee who is able to perform any duties, even part-time, in any occupation. Under these circumstances the *Woodrow* case, *supra,* is not applicable to the part I, section 2(a) of the private plan involved in this appeal.

It is reiterated that Kazala is not entitled to benefits under part I of the Prudential private plan.

### Eligibility for Benefits under Part II, Section 2(e) (State Plan Benefits)

Since Kazala is admittedly a covered individual under *L.* 1948, *c.* 110, *p.* 594, *sec.* 13 *et seq., N. J. S. A.* 43:21–37 *et seq.,* and therefore is qualified to that extent for benefits within part II, section 2(e) of the Prudential private plan, the remaining question is whether he is eligible to receive payment of benefits under the provisions of the state plan thus incorporated in this part of the private plan.

Repeating the statutory formula, we find it to be disability "resulting in his total inability to perform the duties of his employment." *L.* 1948, *c.* 110, *p.* 588, *sec.* 5, *N. J. S. A.* 43:21–29, *supra.*

In the absence of evidence introduced by Prudential to the contrary, the record contains evidence from which it reasonably may be inferred that Kazala's condition totally disabled him from performing the duties of his employment as staff manager for Prudential. This being so, there remains to be determined the period for which benefits should be paid.

Prudential further contends that no disability benefits should be allowed Kazala for that portion of the period covered by the order subsequent to November 15, 1951. The statute, *L.* 1948, *c.* 110, *p.* 595, *sec.* 15, *clause (e), N. J. S. A.* 43:21–39(e), precludes the allowance of benefits "for any period during which the claimant performs any work for remuneration or profit." Kazala performed work and sought commissions both on real estate and insurance sales. He obtained a real estate salesman's license and became actively associated with a real estate broker. He had professional cards and calendars prepared for distribution showing his connection with this new occupation. His activities therein were substantial and continuous from the "middle" of November 1951.

Although the evidence is that Kazala did not make monetary profit or receive financial remuneration from his real estate activities, still the philosophy of the statute relates to the physical ability to perform any work. It is not always that one engages in work that results in a pecuniary profit or remuneration.

Prudential further contends that Kazala is not entitled to benefits under the state plan prior to October 31, 1951. The statute clearly supports this contention. It prohibits allowance of benefits for the first seven consecutive days of disability. *L.* 1948, *c.* 110, *p.* 595, *sec.* 15, *clause (a), N. J. S. A.* 43:21–39(a).

As hereinbefore stated, we conclude that Kazala is entitled under part II of the Prudential private plan to recover benefits under the statutory formula (*i. e.*, the state plan) for the period of October 31, 1951 to November 15, 1951.

## CONCLUSION

For the reasons expressed in this opinion, the order of the Disability Insurance Service, Division of Employment, of the State Department of Labor and Industry is hereby vacated and remanded for entry of an appropriate order consistent with the conclusions expressed herein. No costs will be allowed to either party.

*For vacation of order*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*Opposed*—None.